Mr. Caffarelli? Thank you, Your Honor. Counsel, good morning. Thank you for your support. David Cohan and Susan Schardt have worked as salespeople for Medline, which is a medical products manufacturer. And when they started, they each signed employment agreements, which read, in part, Medline shall pay the salesperson commissions with respect to the corrections of all sales made to customers in their territory. So, as with most contracts, it also had another clause that read that this is the entire agreement between the parties, and it can only be amended if it's in writing, signed by the salesperson. So, which, based upon that plain language, led Mr. Cohan and Ms. Schardt to believe that if they make a sale and collect it, they get a commission. But eventually, they discovered that that's not the way Medline was paying them. Medline's practice was to aggregate the sales for a particular month, aggregate the increases and decreases, compare that month to the previous year, and then pay a commission if the aggregate was higher. So, basically, a system of credits and deductions. Now, you don't dispute that Medline reserved the right in the agreements to amend the commission schedules or the commission payment plans? Correct. That's right. And the parties agreed to that? They could amend. And we agree that the payment plans, the pay plans, are part of the commission structure. So, we're not disputing the fact that they look at month-over-month growth. We're just disputing, as I'll discuss, the negatives from that in the negative period. Right. And didn't it say, though, month-to-month growth to the assigned territory? Right, within the assigned territory. Okay. Right. And so, the agreements, though, in Medline's system, they refer to negative commissions or negative growth, again, which is not in any of the pay plans or employment agreements, which offset these positive commissions. And so, if the aggregate was lower than the previous year's aggregate, another thing that Medline did was to assign a negative value to the aggregate and carry that negative value over to subsequent months and deduct that from the subsequent months' commissions. So, Cohen and Chart sued, claiming that this scheme was basically in conflict with the employment agreements and pay plans. District Court determined that the commissions weren't earned until after the aggregation and that Cohen and Chart had implicitly agreed to this system and granted summary judgment for Medline. And so, this appeal actually only involves a very small part of the district court's opinion. The application of New York and California law on pages 24 through 27. And I believe that the parties seem to agree that the analysis is the same under both New York and California law, and they seem to agree, and the district court held, that no deductions can be taken from what are considered to be earned commissions, even if that's agreed to by both parties. And that's what the Genny's or Jenny's case was about out of New York. The key here is determining when the commissions are earned, because once they're earned, you can't take the deductions. It's our position that these commissions are earned on a client-by-client basis based upon each sale. It's Medline's position that they're earned after being aggregated for each month. Right. Where's the contractual authority for your position? Well, the contractual authority is by looking at the employment agreements and the pay plans and interpreting them as a whole. And it's basic contract analysis. Again, these are documents that were drafted by Medline. They need to be interpreted against the drafter. And so, if you look at the language, the agreements refer to earning monthly commissions on sales. Again, it's the plural, not the singular, which suggests to me that the parties had agreed to a client-by-client plan, not an aggregation plan within the actual employment agreement. They refer to collection of sales, which triggers the commission. And so that simply doesn't square with this idea of negative commissions, because remember, negative commissions, or what they're calling the oxymoron negative growth, occurs when a client does not renew its contract. So if a commission is paid upon the collection of a sale, there is no sale for a non-renewed contract. So the agreements simply don't contemplate that a deduction is going to be made for the non-renewal of a sale. It only pays for collections on sales. The agreements and the pay plans only refer to growth, that commissions are paid on growth. There's nothing about losses in either of these documents. There's nothing about what Medline subsequently termed net growth or negative growth or negative commissions. Again, it's our position that these terms were all created after the fact to avoid saying the word deductions, which in practice, they're actually deductions. So the district court here relied heavily on the Pachter case. And, Your Honor, you're absolutely right to look at the contracts first, because under the Pachter case out of the New York Court of Appeals, which is the highest level court in New York State, the court said that there's a three-part analysis. First, you look to the written agreements, and you determine what the written agreements say. And in the absence of a written agreement, only then do you look to see if there is an express or implied agreement as to the payment plan. And again, the agreement has to be as to when the commissions are earned, because the parties, as a matter of law, cannot agree to deductions. They can only agree as to when the commissions are deemed earned for a particular month. But not just when, but how they're earned, correct? They can agree to that, too. They can agree to how they're earned, right, as long as it doesn't involve deductions. And in the absence of an express or an implied agreement, the Pachter court says that you go to the common law. You look to the common law. And under the common law, commissions are owed upon the production of a ready, willing, and able purchaser. That is, client by client, the way salespeople have been paid for decades and decades. In Pachter, there was no written agreement, so the court skipped directly to Step 2, whereas here we have written employment agreements and written pay plans. But for some reason, the district court, instead of looking at the plans and the agreements, simply concluded that they didn't say anything about it and skipped directly to Step 2 and performed an analysis of whether or not the parties had reached an agreement. We disagree, obviously, on the district court's, with regard to the district court's statement, that there were no written agreements. Our position is that these agreements are clear and they can only be read in one way, such as the commissions are earned on a client by client basis. This concept of negative commissions, and in particular the concept of carrying a negative balance month to month until it's paid off by a salesperson, simply cannot be read consistently with the language of these agreements. I've gone through the contract analysis, but let's assume for the sake of argument that there are no agreements or that the court determines that these agreements are ambiguous or somehow inconclusive, which again, our position is that that's not the case. The only way Medline wins is if a fact finder determines that the parties jointly agreed to apply Medline's formula and that these were not deductions as a matter of law. And the district court here relied solely on the fact that Mr. Cohen and Ms. Schart continued to work with Medline once they discovered through what in essence was their pay stubs that negative commissions were being taken out of their positive growth. That's when they noticed it, that's when they complained about it, and that's when they were told, well, this is the way that we do things, and they continued to work there. Mr. Cavarelli, is it true that the plaintiffs could also gain commissions in their territory for matters they did not produce? They gained, well, no, it was for their sales. Oh, but what about sales in their territory that they did not, doesn't that compute into the overall negative positive approach? I thought Section 6A of the appointment agreement provides salespersons to earn commissions from sales in their territory irrespective of whether a salesperson shall have been responsible for such sale. That's correct. I mean, that's reading the contract. I'm just trying to see whether that tempers us at all. Right. I appreciate your argument. Right, no, no, no, I understand, Your Honor. That's my understanding. It's unusual for a client to approach Medline and say, for example, we want to buy your products without a salesperson actually procuring that sale. But it's true that there are assigned territories, and if the sale is consummated. Yeah, but I mean somebody else in the territory could have produced the sale. That's correct. Each salesperson has his or her own territory, and, yes, if the sale is made in that territory, the salesperson gets it. Who are the clients? The clients are, I believe, hospitals. Well, that's what I'm having trouble figuring out, whether they're individual doctors or clients or. . . Yeah, doctors, hospitals, I mean, whoever would use medical devices, basically. So, again, to distinguish Pachter, again, the difference between the salesperson in Pachter and Mr. Cohen and Ms. Schart, again, in Pachter we didn't have a written agreement, so there was no contract analysis performed. Ms. Pachter knew about the formula up front before accepting the position and actually chose it over a salary. She was given the option of using this formula or having a salary, and she chose the formula. And during her entire employment, she never complained about it. She never said anything negative about it. It was only after she left her employment that she complained about it and went back to try to recoup the deductions. And the court said, no, you knew about it before you signed up. You chose it over a salary. There was no written instrument. You never complained about it while you were there. You can't recoup that. Whereas here, Cohen and Schart didn't know about the negative commissions or the negative carryovers when they were hired. When they found out about it, they disputed it regularly, loudly, and vociferously. And I think the district court agrees with that in its analysis. It actually pointed out how often they disputed the method in which the pay was being calculated. And so the evidence, I believe, shows that there, in fact, was disagreement. And if there is no written agreement or an ambiguous written agreement and there is disagreement among the parties under Pachter, we default to the common law rule. And the common law rule is you get paid for the sales that you consummate on a client-by-client basis. You've talked a couple times today about the month-to-month carryover and spent some time in your reply brief discussing that. Where did you discuss that at the trial level in your papers? That was described as part of the overall scheme. There were actually cross motions for summary judgment. No, I'm familiar. I just didn't see the same depth of argument, let's say, or that claim being raised specifically at the trial court level. And I believe that Epley has claimed you've waived it. I didn't see them argue that we're waiving it. We described it in the briefing. But the thing is that it was described as a larger scheme of taking deductions from these earned commissions. They certainly don't deny it, and they raised it and spoke about it in detail in their response brief. So I'll reserve the rest of my time, if I may, for the rebuttal. Thank you. Thank you, Scott. Ms. Ramsey. Good morning. May it please the Court, Counsel. I'm Amy Ramsey, and I represent the defendant Epley's Medline Industries, Inc., and Medline Sales. This case, as you are aware, is about commissions and whether or not there was an unlawful deduction from commissions. Could you go back? It's the same question I asked your opponent. What are they selling? They're selling medical devices and medical supplies. Well, I know it's advanced wound care. That's the title. But what is it? They have a vast array of products. It could be bandages or IV bags, just a vast array of things. All the kind of things you find in an emergency room. Yes. And the commission plan, specifically at issue here, is not what we traditionally understand as commission, which is a person sells something and they get a percentage based on each and every sale. This is different. What they were hired to do and what they were paid to do is to grow the business. So Medline's plan doesn't look just to individual sales. It looks at the entire business. Well, they have to add clients then, right? Right. Primarily not getting back again. I know you don't want to talk much about it, but tell me what the heck they were selling. Were they selling to physicians? Were they selling to emergency rooms, to hospitals? All of the above. How did you grow this? So Medline, at the beginning, when they entered into the agreements and started paying under the growth plan, was in growth mode. So the market was, I guess, less saturated. They were able to sell to any number of hospitals, doctor's offices, urgent care facilities that they would approach. Medline was entering this business. They already had competitors who were already selling to those. Right. And so to encourage the growth, they created a pay plan that, instead of paying commissions on an item-by-item basis, they would pay based on whether or not your growth this year is greater than or your book this year is bigger than your book last year. And that was the basis of the growth-based commission. That's what was rolled out in the pay plan. That was what everybody was operating under. And the district court found that, yes, the plaintiffs agreed to work under these pay plans and that this was not an unlawful deduction because the agreement was that these accounting for the decline in growth and counting how big the growth was, you'd have to look at both the decline in sales coupled with the increase in sales to assess the overall growth of the territory. That was what the parties understood. That was what the parties agreed, as the district court found, and that it wasn't an unlawful deduction as a matter of law. So is it your position that you don't really know what a commission is on an individual sale until the end of the year? It's tracked. They get reports every month on what commissions would be on a sale compared to sales this month compared to sales last month. It's very transparent in the reports. They get monthly. I appreciate that. But are you saying you really can't compute the final commission until the year-end gross number is there? You only get a tentative one. Well, technically, yes. So it rolls up into the year. So starting in January, the plan looks at what you did to January last year compared to January this year. If that's a positive number, you've grown, and you get paid commissions on that number. If it's a negative number, meaning sales have declined instead of grown, there are no commissions paid. In February, when you do the same comparison to February last year and February this year. I don't mean to interrupt you, but that's my point. So it's not until the last day of the month that you know what the commission is. Is that your position? That is true. But along the way, if the book of business gets in the black, so to speak, it's positive, then commissions are paid. So there's a check-in every month to see how you're doing month-to-date, year-to-date. And if year-to-date, based on the carryover of any negatives, if your overall year-to-date is positive at that point, that's when the commissions are paid. Where in the written document does the month-to-month carryover of any negatives? Where can we find that? It's implicit in the year-to-date growth. It's just in the language of we're measuring year-over-year growth, because if it had just been saying we're measuring month-over-month growth, that might be a different story. But not only do the plans say it, and certainly Mr. Cohan's continued employment agreement says year-over-year sales growth. That's also what was reinforced and explained to the parties in numerous ways. They saw it in the pay plans. They went to annual meetings and learned about how the plans worked. They had the opportunity to ask questions about how the plans worked. And as Mr. Caffarelli said, they expressed disagreement with how the plans should work. But that doesn't entitle them to get paid in the manner that they prefer to be paid. That would, I think, be like me telling my law firm that I need to be paid a million dollars. And if they say no, that doesn't entitle me, if I continue working, to get that million dollars. It just doesn't work that way. And it doesn't work that way under Medline's agreement either. In order to be an unlawful deduction as a matter of law, the deduction has to come after the commissions are earned. And all of the documents and all of the course of dealing between the parties confirms that the agreement was that the calculation looks at the entire book of business for the entire year, checking in on a monthly basis. And if there is a growth, it's the growth that you get the commissions on. This isn't an unlawful deduction below the line. It's an above the line calculation to determine what the commissions are. It's not something removed after you've earned commissions. And Mr. Caffarelli made points about the employment agreement. The employment agreement certainly does say commissions will be paid on sales made in the territory. It also, in paragraph 6H, reserves the right to modify and pay according to a commission plan. Once those plans were put in place and they were paid on that plan, which is an entirely different concept being growth-based than what was set forth in the employment agreement, it was the pay plans that controlled. So it's no longer relevant that the plan or the employment agreement says commissions on every sale. That's not how it works anymore once the other pay plans were put in place. So that I understand, Ms. Ramsey. So in the middle of the month, are any commissions earned at that point? Nothing is earned until the comparison of last month or last year to this year. I'm trying to get to a temporal sense of when a commission is earned. Certainly the sales are tracked, and somebody can look to see what their commissions might be. But you never know until the final calculation is done that we'll assess the business you lost in your territory. No, I think I understand the math. I just wonder when it occurs, when the commission is, quote, earned in the sense that it's set in stone. I'll try to answer you and make sense. It's earned monthly if at that point you're showing growth. Then you can be commissioned immediately on that growth at that point in the month. Otherwise, if it's negative in January, negative in February, you might not get paid any commissions until perhaps March when you have a big month and year to date you're above where you were last year. Well, under your example, then there are no commissions earned in January or February. That's correct. And these employees were paid base salary plus commissions, and that's what they agreed to. And the idea of growth really is this is the incentive that Medline wanted to put out there. This was what they were promoting as growing the business. And it really doesn't make sense to try to measure growth just based on the accounts that grow. When we want to look at the entire territory as contemplated in the agreement, you need to assess where you've got declines as well. If I want to grow my bank account, I'm not just going to look at my deposits and not look at what I'm spending and deducting from that account. That's how you measure how much there is. How many salespeople did they have? I don't know. Sorry. In this case, I wasn't focused also on where they have salespeople in the relevant jurisdictions because this started out as a nationwide class action. They do sell nationwide, apparently. Nationwide. And they have, I believe, salespeople in 32 states. Thirty-two states? Thirty-two states. And council also said that the commission plans don't say anything about what happens to the negative number. And it's true that the commission plan examples show a sample calculation, and that sample is a positive number. However, basic math shows that if you take a number and then you subtract a larger number, that yields a negative number. And with the concept of growth-based commissions, it's understood that you're not getting paid on a negative number because there's no growth there. The main idea, apparently, and you can tell me if this is not correct, is that they have to displace other providers to grow, right? Possibly. I mean, they could interest a customer in new products that another provider doesn't have. That's why I was asking what you made. They could try to edge out the competition. They could try to undercut prices. But if it's gauze and other things like that, you're not producing new types of products. Not necessarily. They sell other things, mattresses. I mean, there's just a wide array of things that could be used in hospitals. And the techniques that they would use could be anything. So we're getting down to now it's hospitals. It's not doctors. It's doctors, hospitals, urgent care centers, all of those things. There's an independent basis. One of the other things I'm getting to is how common is this particular agreement among the industry? It's my understanding that in this industry or in any industry where there is a growth, a big growth industry, that this is fairly common. There's a third basis on which this court can affirm summary judgment or decide de novo that under California law the claim cannot succeed. And that's because California courts hold that there's no private right of action for Section 221 of the California Labor Code. Under California law, a private right of action exists only if the language of the statute or legislative history clearly indicates to create a right to sue for damages. And Section 221 actually doesn't create a right to any wages or penalties in and of itself. It authorizes a civil penalty that the labor commissioner can try to recover, and it establishes that violation of Section 221 is a misdemeanor. But it does not authorize a private right of action, and several courts have concluded that there is no such private right of action. The district court declined to decide the case on that basis, but this court independently could do so. Does anybody have any further questions? Apparently not. Okay, thank you. Thank you, Ms. Ramsey. Mr. Garofalo. Thank you, Counsel. First of all, when you look at the pay plans, they don't say year to date. They say year over year, and I believe that that's an important distinction. When you look at the examples in every single pay plan, they compare, say, March 2006 to March 2007, or May 2009 to May 2010. There's no reference to a negative carryover from previous month or that these commissions are being calculated on a yearly as opposed to a year over year monthly basis. And, again, the employment agreements refer to monthly commissions. So, again, there's the way Medline was doing things, but there's the way that I believe that these agreements, pay plans, must be interpreted, and that's in the context of the employment agreements. It's important to note, again, that these pay plans don't supplant the employment agreements. They supplement the employment agreements, and they must be read consistently with the employment agreements. And that's where I think that the district court went astray and what Counsel is arguing that this court only need look at the pay plans, but in actuality, pay plans must be read in context with the employment agreements, and all of the language in the employment agreements, when read in conjunction with pay plans, point to these commissions being calculated on a month-to-month basis and awarded on a client-by-client basis, and it's the only way to read the language within the employment agreement. Every single example in the pay plan refers to growth, so there are no negatives in the pay plans. If you look through each and every single one of them, they could have done this at any point. They could have said we're including negatives and put it in the pay plan or give an example of a negative carryover, and they never did that. And the problem with only including growth is that you can't see the breakdown because the breakdown is the same. Two plus two plus two is six. Whether you say it's six or two plus two plus two, it's the same thing. But if you emphasize growth in a pay plan, is that going to be just growth as to client A, or is that growth as to the entire territory, which in which case speaks to having to compute all the sales? Well, again, it's growth. It's not net growth. It's not growth for the entire territory. It's growth in the territory, and that's where I think the parties get caught up, and there's an argument that that's ambiguous. Does that mean, you know, because growth could be just new contracts, or it could be, as they argue, new contracts minus other customers that don't renew their contracts. And what we're saying is that even if the court concludes that the term growth is ambiguous, you can't take a negative for a client that doesn't renew because there's no sale, there's no commission, and the employment agreement says that they're only being paid on sales. There's a question if there's a sale and, for example, the hospital orders less, there's still a sale. Arguably, you include that. I don't think you do. I still think that's a deduction. But if there's a non-renewal, then that's just simply not contemplated under the employment agreements as a negative, and particularly not this concept of negative carryover. Again, and to summarize, if there's any ambiguity, if there's any doubt, the default here is common law. Salespeople are different than lawyers. It's not a question of whether they were promised to be paid a million dollars. Salespeople traditionally have been paid commissions on sales, and there's a body of common law that surrounds that. And a contract will control. And then if there's no contract, an agreement will control. And if there's none of the above, then whatever the percentage is on each sale, that's what the salesperson gets. Let me ask you this. If a company employs this term growth, as we have here, is this to address the issue of, let's say, a top-flight salesperson does really well for three weeks and figures I've made enough under his or her assessment of a daily commission, but the company wants you to be that top-flight salesman for 30 days or whatever, is this the kind of plan to keep you on the firing line all the time, not just you satisfied you've made enough, quote, commissions if we take your assessment of how a commission is earned through three weeks? Is that what we have here? Right. Your Honor, and it's funny, I've never known a salesperson who would not take more money if they could get it. But I don't think so. I understand what you're saying. I'm just wondering, is that the driver in this plan and whether that's apparent to a salesperson in this particular industry? I think the driver, I think that what Medline wanted to do was have its salespeople go out and get new business, steal the business from the competitors, grow the existing clients, and that's certainly the way my clients understood it. What they didn't understand was that they would be dinged, and, for example, Mr. Cohen, due to Hurricane Sandy, for example, lost a lot of money because the hurricane came through through no fault of his own. The hospital stopped ordering, doctors stopped ordering, and then he had this negative carryover for months and months and months, and he could never dig himself out of the hole. And those are the types of things that the wage laws are meant to guard against. Salespeople shouldn't have to cover a company for its business losses. It's like the minimum wage. It's like overtime. You can't waive these things. Well, there is a base salary, I assume, in these cases, isn't there? I'm not sure if there was an advance or a base, but I'm not quite sure. I don't know. Does the record tell us where there is? It says something about salary, but I'm not sure. There may very well be. We're just talking about the commission. Well, I was just trying to relate to that body of law that you were just saying. I understand. And the question of intent, I think, is an interesting one, again, but I think that a lot of these intent issues, it's all extrinsic evidence. When you have written documents, unlike Packard, we have written documents here. If you look to the written documents, an employment case should be no different than a dispute between IBM and GE. Nobody asks, well, what did IBM mean about this? Let's look at the documents. These contracts they enter into with their clients, how long are they for? Are they four a month? Are they four a year? Are they six months? I mean, how often do they turn over? Yeah, I don't know that they're for a term, but they're executed and countersigned. I mean, certainly contracts that are not for a term have been held against employees many times. So to enforce arbitration agreements, for example. So I don't think that's necessarily dispositive of whether or not how they describe commissions should be taken into account. Thank you. Thank you. Thanks to all counsel. Case is taken under advisement. Court will proceed to the fourth case, Dobbs v. Law.